UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 5:16-CR-85-DCR-REW-1 |
| v. ) | |
| ) | RECOMMENDED DISPOSITION |
| ROBERT LEE SHIELDS, ) | |
| ) | |
| Defendant. ) | |

\*\*\*  \*\*\*  \*\*\*

Defendant, Robert Lee Shields, by counsel, moved to suppress all statements he made to law enforcement on the date of his arrest, August 26, 2016, and on the date of his transport by law enforcement from Campbell County to Fayette County, August 29, 2016. DE #33 (Motion to Suppress). The United States responded in opposition. DE #38 (Response). The Court held an evidentiary hearing on November 18, 2016. DE #45 (Minute Entry). The Court has reviewed the entire record, including three witnesses' testimony, the parties' briefing, counsel's arguments, and the applicable law. For the following reasons, the Court **RECOMMENDS** that the District Court wholly **DENY** the motion to suppress (DE #33). Shields's motion challenges the voluntariness of his confessions and other statements to law enforcement. The Court finds that the United States proved that the statements Shields made were voluntary as a matter of due process (and the consonant *Miranda* standard, to the extent applicable).[1]

---

[1] For efficiency, the Court elected to proceed without the written transcript, which Defendant has ordered. The Court re-audited much of the recorded testimony.

1

*The Voluntariness Standards*

Lexington DEA pursued Shields as the alleged source of fentanyl distributed around Montgomery County in late August 2016. Authorities preliminarily attributed a spate of overdoses, including one fatality, to the batch of fentanyl involved. The DEA promptly identified the local source, and that local source (co-Defendant Wesley Hamm) quickly implicated an Ohioan named or known to him as "Sosa." A controlled buy effort led the DEA to Shields on August 26—Hamm directly identified him as Sosa in the area of a planned drug buy, and police arrested him. Shields participated in interrogations on August 26, immediately after his arrest, and then on August 29, as the DEA transported him to the first court appearance in Lexington. Shields made incriminating statements on both occasions, and these are the statements Shields targets by his motion.[2]

First, the Court notes that there is no dispute over issues of custody, interrogation, and procedural compliance with *Miranda*'s prophylactic measures. Authorities did question Shields (who was under arrest and handcuffed or held in a police vehicle) in custody,[3] but only after a law enforcement agent gave Shields *Miranda*-compliant warnings. Shields understood those warnings and knowingly decided to communicate with authorities despite his rights awareness. Shields himself testified that he received and understood the *Miranda* warnings provided.

---

[2] Other than the intervening passage of time, Shields does not argue that the circumstances of the August 29 interaction differed materially from the circumstances of the August 26 interaction. Defendant had the weekend in custody to contemplate the situation, but Shields does not attribute the delay to police impropriety. The arrest happened on a Friday afternoon, and the Court saw Shields (after signing the post-arrest Complaint on Saturday, August 27) on the following Monday.

[3] *See California v. Beheler*, 103 S. Ct. 3517, 3520 (1983) (regarding the "in custody" requirement: "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.").

The key here is the voluntariness of Shields's communications. Both the *Miranda* waiver and the decision to answer questions or communicate must be voluntary, but the analysis is substantively the same. As the Sixth Circuit recently summarized:

> "Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda v. Arizona*, 86 S. Ct. 1602, 1630-31 (1966)). Such a waiver must be made voluntarily and free of any coercion. *See Moran v. Burbine*, 106 S. Ct. 1135, 1140-41 (1986). Similarly, an accused's confession must be "made freely, voluntarily and without compulsion or inducement of any sort." *Haynes v. Washington*, 83 S. Ct. 1336, 1343 (1963). The government bears the burden of proving—by a preponderance of the evidence—the voluntariness of both an accused's *Miranda* waiver and confession. *See Colorado v. Connelly*, 107 S. Ct. 515, 522-23 (1986). "The test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary." *United States v. Redditt*, 87 F. App'x 440, 445 (6th Cir. 2003) (citing *Connelly*, 107 S. Ct. at 523).

*United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016), *petition for cert. filed*, 85 U.S.L.W. 3086 (U.S. Aug 26, 2016) (No. 16-253).

The analysis considers the "totality of the circumstances." *Bray v. Cason*, 375 F. App'x 466, 469 (6th Cir. 2010). The Sixth Circuit phrases the test as involving three necessary considerations:

> In determining whether a confession is involuntary due to police coercion, this court employs a three-step analysis [requiring that]: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements."

*Binford*, 818 F.3d at 271 (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).[4]

---

[4] *See also United States v. Fowler*, 535 F.3d 408, 416-17 (6th Cir. 2008) ("An incriminating statement is deemed to have been coerced 'when the conduct of the law

*The Hearing*

The Court conducted a lengthy hearing to examine the particular circumstances of the statements at issue. *See* DE #45 (Minute Entry). At the hearing, both sides had a full and fair opportunity to present witnesses. *See id.* The parties presented starkly different stories regarding the allegedly coercive remarks made by law enforcement to Defendant Shields during Shields's August 26, 2016, questioning and his August 29, 2016, transport from Campbell County to Lexington, Kentucky. The Court recounts the proof as presented at the hearing. *See id.*

The United States first called Cincinnati Police Specialist Charles Vanover, a DEA Task Force Officer present during Shields's arrest.[5] Vanover testified that he arrived on the scene of arrest after law enforcement apprehended Shields.[6] After searching Shields's person for contraband, Vanover stood nearby awaiting the arrival of Lexington DEA agents. Per Vanover, Shields attempted to engage him in conversation, asking Vanover what was going on and if they could talk. Vanover resisted, but given Shields's persistence in asking questions, Vanover eventually *Mirandized* Shields.[7] However, Vanover did not engage in any substantive discussions with Shields. When the

---

enforcement officials is such as to overbear the accused's will to resist.' In considering whether a defendant's will has been overborne in a particular case, relevant factors 'include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep.'" (quoting *United States v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002))).

[5] Vanover acted as a liaison between the Cincinnati Police Department and Lexington DEA agents, who were the lead investigators.

[6] Defendant was in handcuffs upon Vanover's arrival.

[7] Vanover stated he used the standard DEA *Miranda* warning card, which encompasses all required warnings. According to Vanover, Shields responded affirmatively that he understood the warning given and still wanted to talk with law enforcement. During his testimony, Shields agreed that Vanover read him his rights and that he understood his rights as read.

4

Lexington DEA agents arrived, Vanover informed them that Shields wanted to talk. Vanover indicated that, based on his twenty years of law enforcement experience, he felt Shields wanted to cooperate with law enforcement. Upon Lexington DEA's arrival, Vanover's involvement ended.

      The Government next called DEA Special Agent Jared Sullivan, the agent in charge of the investigation. He testified that he became involved on August 25, 2016, when local authorities reached out regarding multiple drug overdoses, including one death, that had occurred in Montgomery County. Investigators identified co-Defendant Wesley Hamm as the local source of fentanyl allegedly involved in the overdoses. Hamm cooperated with authorities and provided a description of his fentanyl supplier, located in Cincinnati, who he knew only as "Sosa." Under DEA direction, Hamm, via phone, arranged a controlled buy with "Sosa." On August 26, Shields arrived in the area of the controlled buy in Cincinnati, and Hamm identified him as "Sosa." Law enforcement pursued and promptly arrested Shields.

      Sullivan arrived on the scene of arrest "at least ten minutes" after the arrest. He stated he was approached by a Cincinnati investigator (possibly Vanover), who told him that Shields had been read his rights and wanted to talk. Sullivan testified that he interpreted Shields wanting "to talk" to mean he wanted to cooperate. SA Sullivan approached Shields, who was handcuffed and in the back seat of a marked police cruiser. Shields stated he was willing to cooperate, and Sullivan asked him the location of his source and the fentanyl or other narcotics suspected to be in Shields's possession or control. Shields indicated the drugs were nearby but was hesitant to elaborate further

given the civilian spectators that had gathered.[8] Agents eventually transferred Shields to an unmarked SUV, where a majority of the August 26 interview took place.[9]

SA Sullivan testified that he had read the motion to suppress briefing, and he specifically and categorically denied making the alleged threatening statements. *See* DE #33 (Motion to Suppress), at 2 ("When Mr. Shields continued to claim a lack of knowledge [regarding any narcotics], he remembers that the agents were more specific, telling him: 'If you don't tell us we will make sure you do life, unless you give us somebody. If you do, I can make sure you don't do life'.") Sullivan testified that he "wouldn't have even known that life was a possibility in this investigation"[10] because "at that time we were arresting him for conspiracy." Sullivan stated he "would have advised [Shields] that this investigation has overdoses in it and if you get charged with that that could be upwards of twenty years. . . . I would have been honest with him about that but I wouldn't have made up something about life and uhm I certainly would not make any comments as to 'I can make that go away' if that was the case." Sullivan adamantly testified that he cannot make promises of that nature to defendants. He emphasized the fact that Shields had not yet been charged with the overdoses so any reference to life

---

[8] According to Sullivan, Shields was very eager to speak elsewhere, away from the crowd congregating nearby. (Investigators had arrested Shields outside of a school in a relatively busy area.)
[9] Per SA Sullivan, the August 26 interview lasted approximately 1 hour across all locations.
[10] SA Sullivan also testified on cross-examination that this case was his first involving an overdose death and that, at the time of the interrogations, he was unfamiliar that a life sentence was a possibility in such cases. Regardless, SA Sullivan testified that he did not know Shields's criminal history at the time of arrest, which would be a crucial penalty factor.

6

would have been premature.[11] Sullivan did, however, state that he would have mentioned the suspected connection between the alleged distribution and the overdoses.

According to SA Sullivan, during the August 26 interview, Shields repeatedly asked: "What are you going to do for me?" Sullivan explained to Shields that "if he proactively cooperated that information would be provided to the prosecutors and the judges and it could help your situation." At one point, Shields asked for "something in writing," and Sullivan recalled responding: "I have no authority or no position to be able to do that, we don't do that, we can't." On cross-examination, SA Sullivan testified that he would have told Shields: "You're going to be arrested on federal charges today. If you want to help yourself out, now is the time to do it. I specifically was saying the best way to start is to tell me where the stuff is that you were going to give Wesley Hamm today." He further clarified, in response to a question from the Court, that he would have told Shields: "You're in trouble, and one way that people frequently get out of trouble is to cooperate. And if you do [cooperate], that information will be supplied to the prosecutors and judges for consideration for lower sentencing."

Sullivan described Shields as very eager to help investigators, wanting to go home that night and not spend time in jail. To that end, and after moving to the unmarked DEA vehicle, Shields led agents to an alleged stash house. SA Sullivan, two other DEA agents, and Shields drove by the supposed stash house, and Shields identified a man sitting on the porch as "Dave," who Shields presented to agents as his supplier.[12] Shields further

---

[11] SA Sullivan further stated authorities did not know for a fact that the overdoses were tied to the alleged fentanyl distribution. He acknowledged that authorities were hesitant to make such a connection absent detailed toxicology reports.

[12] Investigators later identified the individual as David Brooks. Investigators conducted a "knock and talk" at the alleged stash house and searched the house per the consent of the residents (including Brooks). The search did not yield any contraband. SA Sullivan

7

provided additional names and numbers, some assistance accessing his cellphone (which authorities recovered following Shields's arrest), and other general information during the August 26 discussion. Sullivan noted that Shields acted disappointed when Sullivan ended the August 26 conversations, and Shields continued attempts to cooperate.

SA Sullivan also addressed discussions that occurred on August 29, 2016, when he and DEA Special Agent Matt Morris transported Shields from the Campbell County Detention Center to Lexington for Shields's initial appearance in federal court.[13] Per Sullivan, Shields again initiated conversation and stated he wanted to cooperate. Sullivan testified that he told Shields: "It's passed now, the proactive cooperation is done at this point. So, the only way for you to get consideration would be to provide me with names and phone numbers and any information you can and I make the case without you becase now you're in jail, which I had explained to him on the day of his arrest." Sullivan testified that "it's kind of now or never on proactive cooperation[14] . . . so we didn't get into very many specifics of his charges on the way to Lexington." Per SA Sullivan,

---

testified that he believes Shields lied and intentionally provided bad information to investigators regarding the alleged stash house. Based on Sullivan's training and discussions with Hamm, Sullivan concluded Brooks was not Shields's narcotics supplier. Sullivan testified that Shields, after identifying Brooks as his supplier, claimed Brooks had accompanied him to meet Hamm on at least one occasion. Hamm, who had provided reliable information, described a second male that he had seen on multiple occasions when meeting Shields. Brooks did not meet that description, and, when shown a picture of Brooks, Hamm claimed that Brooks had never accompanied Shields to a meet with Hamm.

[13] Per SA Sullivan, the August 29 interrogation lasted approximately 1.5 hours and did not continue beyond the period of transport.

[14] On cross-examination, SA Sullivan stated he would have told Shields he had a small window to proactively cooperate during the August 26 interrogation. Sullivan further testified that he never indicated, during either interrogation, that cooperation would affect the crime with which authorities eventually charged Shields.

Shields provided several names, his familiarity with the named individuals, and what drugs they were distributing.[15]

Finally, Defendant Shields testified. He stated that "about ten officers" were involved in his initial arrest. Shields testified that he repeatedly asked officers why he was under arrest and told officers he had a right to know why he was under arrest. Officers responded that they could not answer his questions and that he would have to wait for Kentucky DEA[16] to arrive. Shields acknowledged that Specialist Vanover appropriately *Mirandized* him.

Approximately thirty to forty-five minutes after being placed in the back of a marked police cruiser, Shields stated that SA Sullivan approached. Shields testified that he asked Sullivan why he was under arrest, to which Sullivan replied, "I'm pretty sure you know why you're under arrest." According to Shields, when he said he did not know why he was under arrest, Sullivan replied, "Well, someone has died. . . . You were going

---

[15] The Court confronted an objection, during the Government's direct examination of SA Sullivan, when the prosecutor sought to question Sullivan about the fact of and content of Shields's later proffer meeting with the United States. Shields, with counsel, had met with the Government at some point to proffer and discuss resolution of the charges. The defense objected. The Court deals with that objection in two ways. First, because the hearing involved a preliminary question over confession admissibility, Rule 104(a) would make the Rules of Evidence (except privilege) inapplicable. Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."). Thus, at least as to the suppression hearing, Rule 410(a)(4), which bars admission of statements from unsuccessful plea discussions, would not bar reference to the proffer or its content. However, as a matter of relevance, the Court simply finds the fact and content of the proffer as not germane to the question of voluntariness on August 26 and August 29. Tactical decisions orchestrated by and plea discussions involving counsel bear little, if at all, on the scenario Shields faced and choices he made at the time of in-custody and uncounseled questioning. While not off-limits in this context, the Court in no way relies on reference to the proffer in reaching its ruling on the suppression motion.

[16] Shields, who testified to his prior state criminal record, testified he had no prior federal criminal record. He indicated that he knew the situation was serious when officers informed him of DEA involvement.

to meet up with someone today and that someone gave someone the product that you gave them and they overdosed and died." Shields further testified: "Agent Sullivan told me that I was facing life if I didn't tell him where the narcotics was or if I could[n't] give him someone with narcotics that he was going to make sure that I do life. Agent Sullivan also said I could avoid a life sentence. If I gave him drugs or someone with drugs, he would make sure I didn't do a life sentence."[17] Shields stated he viewed these statements as a promise because Sullivan said he would "make sure" Shields received a life sentence if he refused to cooperate.

Shields testified that, following the August 26 interrogation, he spent the weekend in jail prior to his transport to Lexington on August 29. He had no contact with a lawyer over the weekend and claimed to have thought about a life sentence all weekend. During the drive to Lexington, Shields was handcuffed and placed in the front passenger seat. Shields again spoke with SA Sullivan. Shields testified that SA Sullivan said, "Remember, you can help yourself, you can either make this easier or make this harder. We have approximately an hour and a half, two hour drive. You can either help yourself or not. You can either do a life sentence or help yourself and get you somewhere under 20 years. But if you can't help us, I can make sure you do [life[18]]."

During the course of the interviews, Shields made various inculpatory statements concerning his role, his awareness of the substance, and his connections to Hamm and trafficking. He claims he made all such statements involuntarily.

---

[17] Shield claimed that only SA Sullivan made this type of statement to him.

[18] Shields initially said Sullivan stated he could "make sure you do 20 years," but quickly corrected to "make sure you do life."

10

*Analysis*

Shields attacks only the voluntariness of his statements; the Government, which has the burden, defends the statements as voluntarily made.[19] The motion essentially reduces to a factual finding over (and legal assessment of) the circumstances and details of the interrogations. Defendant claims DEA SA Sullivan assured him of a mandatory life sentence unless he cooperated; Sullivan denies this and contends he merely related to Shields the gravity of the situation and the possible benefits of cooperation. Facing a stark factual conflict, the Court has considered the full record, reviewed the hearing testimony, and considered witness demeanor and credibility.

As a factual matter, the Court credits SA Sullivan's version of events for several reasons. First, Sullivan described his approach to cooperation as basically the same in every case, this one included. He explained that proactive cooperation is a time-sensitive opportunity. Further, cooperation can help a defendant because law enforcement would communicate the fact and particulars of assistance to the relevant prosecutor and judge, which could be beneficial in terms of sentencing considerations. Sullivan described that as his customary approach and the one pursued with Shields.

Regarding the particulars here, the Court notes that Sullivan encountered a fluid situation with an unknown defendant (Hamm knew Shields only as "Sosa"). Thus, Sullivan knew nothing of Shields's criminal record. Sullivan also knew that actually linking Sosa to the overdoses would be a complicated proof chain dependent in part on prospective toxicology reports. Finally, Sullivan described this as his first overdose death case, and he candidly admitted to not having detailed familiarity with the sentencing

---

[19] Shields does not make particular arguments under 18 U.S.C. § 3501. His focus is the due process voluntariness calculus.

possibilities under 21 U.S.C. § 841. These facts combine to convince the Court, as a matter of both proof and logic, that Sullivan did not communicate that he would "make sure" Shields received a life sentence absent cooperation. Indeed, Sullivan, who denied even contemplating a life term at the time, communicated nothing of that sort. He credibly denied making any charging threat to Shields (relaying that Shields would only be charged, at that point, with conspiracy to distribute) and he denied making any promises to Shields. He explained the mechanism of proactive cooperation and the possible benefits as tied to informing the judge and/or prosecutor for theoretical ameliorative sentencing impact.

Sullivan was consistent and measured in his description throughout the testimony. He testified to stressing the seriousness of the circumstance (including referencing the overdoses and the desire to interdict the batch involved) and Shields's narrow window of cooperation, but he flatly denied making promises, threats, or coercive quid pro quo remarks. He testified to never mentioning the possibility of a life sentence, focusing instead on the twenty-year default term associated with Schedule II trafficking. While this may be Sullivan's first case involving a death, it is hardly his first case, and Sullivan described his approach to cooperation as the same in every case—present and explain the opportunity, and let the target make a choice. That police encountered Shields as Hamm arranged, in the presence of a likely dirty phone, created situational pressures tied to the alleged criminality, not to police misconduct.

To hear Shields tell it, Sullivan repeatedly incanted the exaggerated quid pro quo threats—either help or face mandatory life. Shields attributed the threats only to Sullivan, and he described Sullivan as promising Shields he would "do life" unless he revealed the

location of narcotics or gave up a supplier. The Court does not doubt that Sullivan communicated the gravity of Shields's state, and the DEA surely hoped to intercept the remaining fentanyl batch, but the Court rejects Shields's fanciful version as unsupported. Part of this owes to Shields's patent credibility problems. For instance, Shields depicts himself as overwhelmed and cowed by the involvement of the DEA. However, as a defendant with multiple drug felonies, Shields showed himself a wily and assertive participant in the discussions. He essentially prompted the August 26 interview, repeatedly demanded information from authorities, insisted, self-protectively, on relocating from the public arrest area, and persistently sought to know precisely what cooperation would mean for him. This conflicts with the depiction of an overborne will and thus hurts Shields's credibility as to the scrutinized events.

Further, even within the August 26 interaction, Sullivan perceived that Shields was lying to him. Thus, Shields, claiming the drugs were nearby, led police to a supply house that was a dead end. He also fingered an alleged co-conspirator that, by description and appearance, conflicted sharply with reliable information from Defendant Hamm. Sullivan suspected that Shields was intentionally misleading him about Shields's source. This intra-interrogation suggestion of falsity blemishes Shields's trustworthiness as a narrator of the day's interactions.

Certainly, "[p]olice promises of leniency and threats of prosecution can be objectively coercive." *United States v. Johnson*, 351 F.3d 254, 261-62 (6th Cir. 2003). However, the cases center on concerns over promises that are "broken or illusory," *id.* at 262, and threats unfounded in law or fact. *Id.* at 263. An illusory promise is one that does not bind law enforcement to particular action or is made without authority. *See id.* 262

13

n.1; *see also United States v. Siler*, 526 F. App'x 573, 575-76 (6th Cir. 2013) (citing *Johnson*). Factually, the Court has already determined that SA Sullivan did not threaten Shields with mandatory life (or indeed with any particular charge or punishment), did not make him any promises, and did not extend an improper or coercive quid pro quo offer. Rather, Sullivan merely (and accurately) relayed the situation Shields faced and described the opportunity and possible benefits of cooperation. Sullivan limited those possible benefits to judicial (and prosecutor) notice, which *could* positively impact sentencing. This was all entirely proper. Indeed, "although police promises of leniency can be objectively coercive in certain circumstances, a statement about possible leniency upon cooperation does not render a confession unconstitutional." *Bray v. Cason*, 375 F. App'x at 469. As the Sixth Circuit just confirmed:

> [P]romises to recommend leniency and speculation that cooperation will have a positive effect do not make subsequent statements involuntary. Further, a promise of leniency in exchange for cooperation . . . usually is permissible.

*Binford*, 818 F.3d at 271-72 (citation and quotation marks omitted). Here, Sullivan at most accurately depicted Shields's conundrum and pointed to cooperation as a possible mitigative avenue. *See United States v. Turner*, No. 14-20019, 2015 WL 687313, at *3 (E.D. Mich. Feb. 18, 2015) ("Conveying to suspects the seriousness of the crime for which they are being investigated does not render a confession involuntary. And although it is true that offers of leniency made during a police interrogation have a coercive effect, a promise to speak with the prosecutor about a defendant's cooperation does not automatically render a confession coerced." (citations and quotation marks omitted)).

The Court finds that police, including SA Sullivan in particular,[20] did not here act in an objectively coercive way. In addition to the findings regarding Sullivan's interactions with Shields, the Court also notes that the interrogations were of limited duration and were not physically coercive. The environment surely involved situational tension, but that was created by the circumstances of the alleged crime, not improper actions of the authorities.

Shields's characteristics also matter. He is a twice convicted cocaine trafficker with at least one prior heroin possession felony. *See* DE #15 (Notice). He has significant and recent experience in the criminal justice system. Shields knew his rights and never sought counsel. Further, he was assertive in seeking information, demanding to know his status, and negotiating with Sullivan. Defendant now tries to describe himself as intimidated by involvement of the DEA, but the Court finds that portrayal incredible. Shields, an articulate and intelligent man, was wily during the attempted buy with Hamm and sophisticated in his interactions with Sullivan (perhaps misleading Sullivan in an attempt to garner cooperation points without actually offering much of substance). Shields's age, experience, and facility with the system contribute to the totality of circumstances that undergird the Court's voluntariness findings.[21]

Finally, while the Court finds no coercive activity, the Court also must remark on indicia of Shields's will and volition. Specialist Vanover, who *Mirandized* Shields, described him as anxious to begin a dialogue with authorities from the moment of arrest—Vanover perceived this as Shields's interest in cooperation. According to

---

[20] The Court also carefully weighed the demeanor and motivations of each witness, taking into account the matters at stake in the case and the biases that could influence testimony.

[21] It is worth noting that Sullivan continued to credit Shields for his legitimate cooperative activity, as the hearing detailed.

Vanover, Shields said, "I want to talk" and "I need to talk to someone" almost immediately. Thus, even before Shields knew (from Sullivan) anything of the particulars, Shields showed a desire to talk. Sullivan confirmed this, describing Shields as eager from the beginning to talk with authorities and explore cooperation. Per Sullivan, Shields had "a lot" to say and was "eager" to cooperate. This evidence sharply cuts against any notion of Shields having his will overborne—if Shields wanted to talk from the inception of arrest, then post-arrest, post-*Miranda* interaction hardly overbore his will.

*Conclusion*

The United States proved by a preponderance of the evidence, under the appropriate due process and *Miranda* standards, that Shields voluntarily made his statements of August 26 and 29. The Court **RECOMMENDS** that the District Court **DENY** Defendant's motion to suppress (DE #33).

\* \* \* \* \*

The Court issues this recommendation under 28 U.S.C. § 636(b)(1)(B). The parties should consult 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b) for specific appeal rights and mechanics. The objection period will be as stated in the Rule and statute, subject to any particular schedule set by Judge Reeves. Failure to object in accordance with the Rule waives a party's right to review.

This the 29th day of November, 2016.



Signed By:
*Robert E. Wier*  REW
United States Magistrate Judge