UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 16-085-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ROBERT LEE SHIELDS, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendant Robert Shields' motion to suppress certain incriminating statements to law enforcement officers. [Record No. 33] The motion was referred to United States Magistrate Judge Robert Wier for review and issuance of a report and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B). An evidentiary hearing was held on November 18, 2016. [Record No. 45] On November 29, 2016, Magistrate Judge Wier issued his report, recommending that the motion be denied in full. [Record No. 50] Defendant Shields has since filed objections to the report. [Record No. 52]

After reviewing all relevant materials, the Court agrees with Magistrate Judge Wier and will deny the motion to suppress.

**I.**

On August 24, 2016, officers arrested Shields' co-Defendant Wesley Hamm. [Record No. 1, Ex. 1, p. 2] Lexington agents with the Drug Enforcement Agency ("DEA") interviewed Hamm regarding his suspected involvement with the distribution of fentanyl that had caused a number of overdoses in the Central Kentucky area, including one fatality. [*Id*.] During the

interview, Hamm implicated Shields as the individual supplying fentanyl to him. [*Id.* at 3] Investigators then arranged a controlled buy from Shields. On August 26, 2016, Shields was arrested. [*Id.*]

Cincinnati Police Specialist Charles Vanover testified that, after the defendant's arrest and while he was waiting for Lexington DEA agents to arrive, Shields repeatedly attempted to engage Vanover in conversation, asking what was going on and if they could talk. [Record No. 51, p. 7] Vanover gave Shields *Miranda* warnings, after which Shields seemed "eager to speak with [him]" and interested in cooperating. Vanover, however, declined to engage in any substantive discussions. [*Id.* at 15] Once DEA agents arrived, Vanover informed the agents that he felt Shields wanted to talk. [*Id.* at 16]

DEA Special Agent Jared Sullivan testified that he arrived approximately ten minutes after the defendant's arrest. A Cincinnati investigator informed Sullivan that Shields had been given his *Miranda* warnings and wanted to talk. [*Id.* at 24] Agent Sullivan then approached Shields who had been placed in the back of a police cruiser. [*Id.*] Shields was allegedly concerned with providing Agent Sullivan information while in the police cruiser where he would be visible to numerous passerby. As a result, he asked to be moved to a more secluded vehicle.[1] [*Id.* at 25, 28]

Once Agent Sullivan transferred Shields to an SUV, Shields began to speak more openly. [*Id.* at 28] Agent Sullivan asked where the narcotics were located, and Shields voluntarily directed him to a nearby house where officers conducted a search. The search did not produce evidence of any narcotics. [*Id.* at 28, 33] Based on his training and other

---

[1] Agent Sullivan stated that he felt that Shields "was worried about looking like he is cooperating." [*Id.* at 56]

information revealed during the investigation, Agent Sullivan felt that Shields had lied and intentionally led law enforcement to a dead end. [*Id*. at 38-39]

According to Shields, Agent Sullivan stated that he would "make sure" that Shields received a life sentence unless Shields directed the officers to the drugs, but would ensure that Shields would receive a lesser punishment if he provided accurate information. Shields claims to have viewed these statements as a promise. [*Id*. at 83]

Agent Sullivan denied making the statements attributed to him by Shields. [*Id*. at 31] Instead, Agent Sullivan stated that he would not have discussed (or threatened) a life sentence because he had no way of knowing whether a life sentence was a possibility at that stage of the investigation, especially since he was not yet familiar with Shields' criminal history. [*Id*.] Agent Sullivan testified that he would have advised Shields that Shields could receive "upward of twenty years" if he were later charged with an overdose death. [*Id*. at 31] Further, Agent Sullivan stated that he would not have made any promises regarding Shields' charges or sentence because he has no authority to make such promises. [*Id*.]

Agent Sullivan testified that Shields never attempted to exercise his right to remain silent, speak to an attorney, or otherwise end the conversation. [*Id*. at 32, 35] Instead, Shields seem eager to cooperate so that he would receive something in exchange. [*Id*. at 35] According to Sullivan, Shields continuously attempted to cooperate, even after he informed Shields that he was being taken to jail. [*Id*. at 32] Additionally, throughout the conversation Shields repeatedly asked Agent Sullivan what Sullivan "could do for him." [*Id*. at 34]

Agent Sullivan stated that Shields expressed significant interest in the effect of his cooperation. In response, Sullivan explained that, if he cooperated, information regarding Shields' cooperation would be shared with the prosecutors and judge and that his cooperation

would be helpful.  [*Id*. at 34, 61]  Agent Sullivan asserted that he would not have promised that cooperation would have affected Shields' charges or his sentence because Sullivan does not have the authority to decide the substance of any charge and is also not permitted to communicate that cooperation will provide any particular benefit.  [*Id*. at 68, 70]  Likewise, when Shields requested something in writing, Sullivan informed him that he lacked the authority to provide written assurances.  [*Id*. at 34]  Shields was then taken to jail where he remained for the weekend.  [*Id*. at 61]

On August 29, 2016, Agent Sullivan and another agent retrieved Shields from jail in Northern Kentucky to bring him to Lexington for processing and an initial hearing before a judicial officer.  [*Id*. at 36]  Sullivan did not re-Mirandize Shields.  [*Id*. at 68]  During the trip, Shields again expressed interest in cooperating, but Agent Sullivan informed him that the time for proactive cooperating had passed.  [*Id*. at 37]  Agent Sullivan explained that, if Shields wanted to cooperate, his only option would be to provide names, phone numbers, and other information that Sullivan could investigate independently.  [*Id*.]  Shields then provided the names of several individuals, his familiarity with these individuals, and the substances that were being distributed.  [*Id*.]

Shields did not indicate that he wished to end the conversation with the agents.  Instead, he persistently attempted to engage and cooperate with the agents and continue their discussions.  [*Id*.]  In fact, Agent Sullivan testified that, "there may have been times when I quit asking questions, but he continued to engage."  [*Id*. at 40]

## II.

The Magistrate Judge recommended that Shields' Motion to Suppress be denied.  [Record No. 50]  At the hearing on this motion, Shields and Sullivan presented dramatically

different versions of the events underlying Shields' statements to law enforcement. For example, Shields alleged that Agent Sullivan told him that he would be facing a life sentence, but promised him that he would receive a lesser punishment if he cooperated. [Record No. 51, p. 83] Conversely, Agent Sullivan specifically denied promising Shields that he would not receive a life sentence if he cooperated. [*Id*. at 31] Instead, Sullivan testified that he would not have made such a promise because he lacked both the *information* and the *authority* to promise anything relating to Shields' charges. [*Id*.] According to Sullivan, he did no more than generally explain the potential consequences of charges and state that cooperation would be in Shields' best interest. [*Id*. at 34]

The Magistrate Judge made a credibility determination and found Agent Sullivan's account to be more credible for a number of very logical reasons. Specifically, the Magistrate Judge noted that Agent Sullivan convincingly explained that his approach to cooperation is the same in every investigation. Sullivan convincingly testified that he presents the opportunity to cooperate and informs defendants that any cooperation would be shared with judges and prosecutors, and that he would have followed this same procedure in Shields' case. [Record No. 50, p. 11] Additionally, Agent Sullivan asserted that he would not have made any statements regarding a life sentence to Shields because he was not familiar with the sentencing possibilities and did not know if a life sentence was available (particularly since Sullivan did not know the nature of Shields' criminal history). [*Id*. at 11-12] Finally, the Magistrate Judge found that Shields' assertions lacked credibility, noting that Shields exaggerated being intimidated by the DEA agents. Further, he found that Shields was not entirely truthful when questioned by Agent Sullivan. [*Id*. at 13]

Relying on Agent Sullivan's testimony, the Magistrate Judge concluded that Shields' statements were voluntary under the Due Process Clause. In reaching this conclusion, he found that law enforcement officers did not act in an objectively coercive way because they had done no more than communicate the seriousness of Shields' situation, present an opportunity to cooperate to the defendant, and explain the potential benefits of cooperating. [*Id*. at 15] Additionally, the magistrate judge concluded that Shields' will had not been overborne, noting his experience with the criminal justice system and the numerous actions he took that suggested that he was not intimidated. [*Id*.] Finally, the magistrate judge found that Shields acted voluntarily due to his having immediately and persistently sought to engage with the officers and at least make it appear that he wished to cooperate. [*Id*. at 16]

In his objections to the Recommended Disposition, Shields does not contest the magistrate judge's credibility determinations. And after examining the record, the Court finds no reason to disagree with the finding that Sullivan was more credible, particularly since the magistrate judge had the benefit of observing the witnesses' demeanor as they testified. As a result, the Court will evaluate the voluntariness of Shields' statements based largely on Agent Sullivan's version of events.

Shields makes his objections based on Agent Sullivan's testimony, and argues that law enforcement officers coerced his confession because Sullivan made various statements that were effectively promises. [Record No. 52, p. 10] Additionally, he argues that the statements that he made on August 29th were involuntary because he had not received prior *Miranda* warnings. [*Id*. at 12] The Court conducts a *de novo* review of the portions of the Recommended Disposition to which a party has specifically objected. 28 U.S.C. § 636(b)(1).

Again however, after examining the record and having made *de novo* determinations, the undersigned agrees fully with the Recommended Disposition.

### A. Due Process Objection

A defendant's confession is involuntary and, therefore, inadmissible in violation of the Fifth Amendment when it is obtained through use of coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Where a defendant argues that a confession was involuntary, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary. *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003). The Sixth Circuit has identified three requirements that must be satisfied for a confession to be deemed involuntary due to police coercion: (i) "the [law enforcement] activity was objectively coercive"; (ii) the coercion was "sufficient to overbear the defendant's will"; and (iii) "the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citation omitted). Here, the law enforcement officer's actions were not objectively coercive.

In some circumstances, a promise of leniency may objectively demonstrate coercion. Specifically, the Sixth Circuit has stated that "promises of leniency may be coercive if they are broken or illusory." *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003). In the present case, Shields argues that Agent Sullivan made illusory promises to him that caused him to confess to the crimes charged. [Record No. 52, p. 10] Shields cites Agent Sullivan's mention of a particular sentence of twenty years and the serious nature of the charges, accompanied by statements that cooperation was the "best way" to help himself, a "good way" to receive favorable treatment in sentencing, and "one way people frequently get out of trouble." [*Id.*] Shields argues that, taking these statements together, Agent Sullivan was "essentially

-7-

promising that [Shields'] cooperation would produce leniency and that failing to cooperate would result in a harsh sentence." [*Id.*] Shields' attempt to characterize Agent Sullivan's vague statements as promises of leniency is unpersuasive.

Generalized statements that cooperation is in a defendant's best interest and that information regarding the defendant's cooperation will be shared with the judge and prosecutor do not rise to the level of a coercive *quid pro quo* promise that a defendant will receive something concrete in exchange for cooperation. *See United States v. Stokes*, 631 F.3d 802, 809 (6th Cir. 2011) ("[P]romises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced."). Agent Sullivan did not promise Shields that his sentence would be reduced if he cooperated. In fact, he did not promise Shields that he would receive more favorable treatment through cooperation. Instead, in response to *Shields'* persistent inquiries regarding what he would receive if he cooperated, Sullivan merely provided an accurate description of the effect of cooperation: (i) Shields was facing serious charges; (ii) it was in Shields' best interest to cooperate; and (iii) information regarding Shields' possible cooperation would be shared with the judge and prosecutor. [Record No. 51, p. 34, 61] Moreover, when Shields requested something in writing, Sullivan refused. [*Id*. at 34] These statements hardly qualify as promises, and it would have been unreasonable for Shields to have concluded that they were. In short, these statements were not objectively coercive in violation of the Due Process Clause.

The other circumstances that Shields cites as being objectively coercive also are unpersuasive. Shields argues that the environment of his arrest was coercive, noting that, among other things, he was in custody, surrounded by law enforcement officers including federal agents, and was not counseled by an attorney. Without question, being a subject of a

federal investigation would be a daunting experience. But while this experience may be stressful, it does not follow that every individual being investigated for serious federal charges is placed in *unconstitutionally* coercive circumstances. If the converse were true, law enforcement would never be permitted to question suspect. Instead, the issue to be addressed is whether law enforcement engaged in improper coercive behavior. *See United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992) (noting the absence of "illegitimate efforts to coerce [the suspects] to confess").

Here, there is no indication of improper coercion. An officer read Shields his rights, including his right to an attorney, and Shields elected to forego those rights and proceeded to discuss the matter. There is no objectively coercive behavior in this case that would allow Shields to avoid the consequences of his decision to cooperate. Additionally, even assuming that there was improper coercion, there is no indication that Shields' will was overborne in this case. *See Wrice*, 954 F.2d at 411 ("The issue is whether the will of the accused has been overwhelmed by official pressure."). In determining whether a defendant's will was overcome, courts consider the totality of the circumstances, including factors such as "the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 423 (6th Cir. 1999).

Shields acted as a willing and assertive participant in the investigation proceedings who actively engaged without being encouraged to do so. As the magistrate judge noted, Shields has been convicted of cocaine trafficking twice and also has at least one prior felony for possession of heroin. [Record No. 15] He was read his rights, but chose to participate in the

investigation rather than remain silent or seek the advice of an attorney. [Record No. 51, p. 15] Additionally, his actions during the course of the investigation indicate that he was sufficiently familiar with the process to decide whether to engage with the officers, and that he voluntarily chose to cooperate.

Soon after he was arrested, Shields immediately—and without prompting—sought to speak with law enforcement officers, inquiring as to the nature of his charges and seeking to cooperate. [*Id*.] He continued to engage with law enforcement throughout the process, voluntarily providing Agent Sullivan with the location of the alleged source of controlled substances and seeking to continue discussions even after Agent Sullivan informed him that he would be taken to jail. [*Id*. at 28, 32] These actions suggest that Shields was fully aware of his situation and his options, but knowingly and voluntarily concluded that his best course of action was to cooperate (or at least make it appear that he was attempting to cooperate). There is no objective or logical reason to conclude otherwise. Accordingly, the undersigned concludes that Shields' incriminating statements were not coerced in violation of the Due Process Clause.

### B. *Miranda* Objection

Shields also makes a brief argument that his statements on August 29, 2016, following his weekend in jail, should also be suppressed because he was in custody and was not re-*Mirandized* prior to giving the subject statements. [Record No. 52, p. 12] Generally, a suspect's statements during a custodial interrogation are inadmissible if they were not proceeded by *Miranda* warnings. *Dickerson v. United States*, 530 U.S. 428, 431 (2000). However, a break in interrogation does not necessarily require that law enforcement re-*Mirandize* a suspect. Rather, "additional warnings are only required if the circumstances

seriously changed between the initial warnings and the interrogation." *Treesh v. Bagley*, 612 F.3d 424, 432 (6th Cir. 2010) (citing *Wyrick v. Fields*, 459 U.S. 42, 47 (1982)).[2]

In making the determination of whether additional warnings were required for the confession to be voluntary, courts consider the totality of the circumstances, including:

> (1) the time elapsing between arrest and arraignment of the defendant, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. 3501(b); *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997). Here, the totality of the circumstances test does not suggest that Shields' statements on August 29th were involuntary due to his not being re-*Mirandized*.

The approximate three-day period from the defendant's initial arrest and the second set of statements to law enforcement officers weighs in Shields' favor. [Record No. 51, p. 61] However, Shields had been informed of the general nature of the charges that he would face at the time these statements were given. [*Id*. at 58-59] Additionally, Shields previously had been advised of his rights to remain silent and to seek the assistance of counsel. [*Id*. at 15] While he was without the assistance of counsel at the time that he made these statements, he voluntarily chose to forego consulting an attorney. This factor is neutral at best.

---

[2]  In his Recommended Disposition, the Magistrate Judge noted that Shields was not arguing that *Miranda* had been violated, and also that he "does not argue that the circumstances of the August 29 interaction differed materially from the circumstances of the August 26 interaction," aside from "the intervening passage of time . . . ." [Record No. 50, p. 2 n. 2]

Further, Agent Sullivan did not initiate the discussions with Shields during this second interaction. Instead, he indicated to Shields that the time for proactive cooperation had already passed. [*Id*. at 36] Despite this statement, *Shields* actively pursued a conversation and continued to discuss the matter during the trip to Lexington. [*Id*.] These actions hardly suggest coercion. Instead, Shields' actions suggest that he was either: (i) interested in attempting to cooperate (and, therefore, voluntarily engaged in discussions with Agent Sullivan) or (ii) attempting to set up a defense to very serious charges.

Moreover, Shields' recent experience with the criminal justice system suggests that he was aware that he could remain silent and/or seek the advice of an attorney. Under the totality of the circumstances, the Court concludes that Shields was aware of his rights, but voluntarily chosen to waive them. The August 29th statements will not be suppressed because law enforcement officers were not required to again provide *Miranda* warnings to Shields.

### III.

For the foregoing reasons, it is hereby

**ORDERED** as follows:

1. The Recommended Disposition of United States Magistrate Judge Robert E. Wier [Record No. 50] is **ADOPTED** and **INCORPORATED** by reference.

2. Defendant Robert Lee Shields' objections to the Recommended Disposition [Record No. 52] are **OVERRULED**.

3. The Defendant's motion to suppress [Record No. 33] is **DENIED**.

-13-

This 22nd day of December, 2016.



Signed By:
*Danny C. Reeves* DCR
United States District Judge